**TUBOS DE ACERO DE MEXICO, S.A.,**
**Libelant,**

v.

**DYNAMIC SHIPPING INC., Potomac Steamship Corp., Feliz Compania Naviera, S.A., District Shipping Co., and Prevcza Shipping Co., Respondents.**

**In the Matter of the Arbitration between POTOMAC STEAMSHIP CORP.,**
**Petitioner,**

v.

**TUBOS DE ACERO DE MEXICO, S.A.,**
**Respondent.**

United States District Court
S. D. New York.

Feb. 2, 1966.

584

Kirlin, Campbell & Keating, New York City, for libelant-respondent, Tubos De Acero De Mexico, Walter P. Hickey and Richard E. Repetto, New York City, of counsel.

Poles, Tublin & Patestides, New York City, for respondents and petitioner Dynamic Shipping Inc., Melvin J. Tublin and Christ Stratakis, New York City, of counsel.

HERLANDS, District Judge:

The two decisive questions posed by these motions and petition seeking arbitration are: whether the party objecting to the arbitration has raised a genuine issue as to the identity of the principals who entered into the charter containing the arbitration clause; and whether the court should summarily order a separate trial of that issue before directing arbitration.

The surface complexity of the facts is a commentary on the conduct of the charter party business through agents, unnamed principals, a multiplicity of corporations, and a variety of foreign flag ships.

### The Charter Party of May 27, 1964

On May 27, 1964, Tubos De Acero De Mexico, S.A. ("TAMSA"), as charterer, signed a contract of charter party (herein "the charter") covering seven consecutive voyages. The other signatory was Dynamic Shipping Inc. ("Dynamic"). The following description of Dynamic's capacity is included in the opening recital of the charter: "Dynamic Shipping, Inc., as Agents for Owners of the Liberian Flag steamer 'WANDERLUST' (Standard American built Liberty) of 7,271/4,469 tons gross 1 net Register or, at Owners' option, Standard American built Liberty substitute. Performing vessel to be nominated latest by August 1st, 1964." In signing the charter, Dynamic described its capacity in the following form of subscription: "Dynamic Shipping Inc. As Agents Only. N. Pateras [sgd]." The name of Dynamic's principal, that is, the owners of the S.S. WANDERLUST ("Owners"), was not mentioned in the charter.

### The Substituted Vessels

The charter explicitly gave the Owners the option to substitute a different performing vessel in place of the S.S. WANDERLUST.[1] Only three of the

---

1. This option is recognized in five different provisions of the charter party:

(1) After the words "steamer 'WANDERLUST' (Standard American built Liberty)," there is a marginal insertion to clause "1" reading: "or, at Owners' option, Standard American built Liberty substitute. Performing vessel to be nominated latest by August 1st, 1964."

(2) A typed heading on the reverse side of the charter party, preceding typed Clauses 16 to 45, reads:

"S/S 'WANDERLUST' or Substitute C/P dated May 27th, 1964."

(3) Clause 16 reads:

"This Charter Party covers seven (7) consecutive voyages; vessel returning in ballast for each consecutive voyage, but Owners have the option of nominating a Standard American built Liberty substitute, always in the same position, to perform any or all of the seven (7) voyages."

(4) Clause 40 reads:

"If a Panamanian, Liberian, Costa Rican, etc. flag vessel is nominated to perform under this Charter, Owners to be responsible for any consequences including time lost and expenses incurred, * * * due to the fact that vessel is flying such flag."

(5) Clause 45 reads:

"Owners guarantee that performing vessel has not called at Cuba since January 1, 1962."

seven contemplated voyages took place. The S.S. WANDERLUST was not used on any of the three voyages. Instead, in connection with each of these three voyages, Dynamic nominated and substituted a different vessel, as follows:

*First Voyage* (completed around November 23, 1964)

Dynamic nominated the S.S. MASTER ELIAS, a Liberian flag ship, owned by Feliz Compania Naviera, S.A. ("Feliz"), a Panamanian corporation. The substitution of this vessel was effectuated by a writing, "Addendum No. 1," dated July 15, 1964. This addendum explicitly refers to the charter of May 27, 1964 and to the fact that it had been "entered into between Dynamic Shipping, Inc., as Agents for Owners of the Liberian Flag S/S 'WANDERLUST' * * *" and TAMSA. The addendum provides that freight is payable "for account of Dynamic Shipping, Inc., as Agents for Owners." It is subscribed by Dynamic as follows: "Dynamic Shipping Inc. As Agents Only. N. Pateras [sgd] N. Pateras." It also provided that all terms of the May 27, 1964 charter were "to remain unaltered" except for the substitution of vessels.

Under date of August 18, 1964, TAMSA and Dynamic signed "Addendum No. 2" which, like "Addendum No. 1," refers to Dynamic as "Agents for Owners."

On July 7, 1964, Feliz and Dynamic signed a Fixture Memorandum whereby the S.S. MASTER ELIAS was made available for the said first voyage; and the terms of the May 27, 1964 charter were expressly incorporated by reference in that memorandum. The memorandum recited that Dynamic was "agents [sic] for Potomas [sic] Steamship Corp." and it was signed as follows: "Dynamic Shipping Inc. As Agents for Potomac Steamship Corp. [sgd] Anthony Pilla" and "Feliz Compania Naviera, S.A. [sgd] N. E. Pateras Attorney-In-Fact."

*Second Voyage* (completed around May 18, 1965)

Dynamic nominated the S.S. AGIA IRENE, a Greek flag ship, owned (according to TAMSA) by District Shipping Co. ("District"), a Greek corporation, and owned (according to Dynamic) by Hellas Parnassos Compania Naviera, S.A. ("Hellas"), a Panamanian corporation. The substitution of this vessel for the second voyage was effectuated by a writing, also entitled "Addendum No. 2," but dated November 23, 1964. This addendum explicitly refers to the charter of May 27, 1964 and to the fact that Dynamic entered into it "As Agents for Owners" of the S.S. WANDERLUST. Dynamic is also referred to "As Agents for Owners" in the provision for the payment of freight and in the subscription.

On November 19, 1964, Hellas and Dynamic signed a Fixture Memorandum whereby the S.S. AGIA IRENE was made available for the said second voyage; and the terms of the May 27, 1964 charter were expressly incorporated by reference in that memorandum. The memorandum recited that Dynamic was "agents for Potomac Steamship Corp." and was signed as follows: "Dynamic Shipping Inc. As Agents for Potomac Steamship Corp. [sgd] Anthony Pilla" and "Hellas Parnassos Compania Naviera, S.A. [sgd] N.E. Pateras Attorney-In-Fact."

*Third Voyage* (completed around August 10, 1965)

Dynamic nominated the S.S. THEONYMPHOS TINOU, a Lebanese flag ship, owned by Preveza Shipping Co. ("Preveza"), a Liberian corporation. The substitution of this vessel for the third voyage was effectuated by a telephone conversation and two confirmatory cables. Dynamic itself time-chartered this vessel from its owners; and, in the time-charter dated June 9, 1965, Dynamic is described as "agents for Charterers." Dynamic signed that time-charter as follows: "Dynamic Shipping Inc. As Agents for Charterers. [sgd] N. Pateras."

*Cause of the Basic Dispute*

The parties differ as to the immediate cause of the dispute. According to TAMSA's libel (65 Ad. 946; filed September 20, 1965), Dynamic made "an unjustified

* * * declaration," on or about July 15, 1965, "that there would be no further performance by Owners under the said Charter Party"; in a letter, Dynamic repeated "this unjustified * * * refusal to further perform the charter"; no vessel has been nominated or substituted to perform the fourth and succeeding voyages under the charter party; and TAMSA has suffered $90,000 damages.

On the other hand, Dynamic claims: "Due to the charterers' repeated failures to pay the owners the freight on time and as it became due, Dynamic, acting as agents for the owners, cabled the charterers' New York representatives on June 15, 1965 advising them that they considered this charter cancelled immediately. The charterers' agents refused to accept the owners' notice of cancellation and claimed that there was no violation of the relevant terms of the charter party."

*TAMSA's Libel*

TAMSA's libel names five respondents: Dynamic, Potomac, Feliz, District and Preveza. The libel pleads the following six causes of action:

the first, naming only Dynamic as respondent, charges that Dynamic entered the charter "as principal, acting for its own account, or as agent for a principal whose identity is unknown to libelant and has never been disclosed to libelant" and that Dynamic is liable in damages for breach of the charter;

the second, naming only Dynamic as respondent, charges that Dynamic breached express and implied warranties of its authority to act for the owners of the various vessels and to bind them to the performance of the charter;

the third, alleging that Potomac was the principal of Dynamic, sues Potomac for breach of the charter;

the fourth, naming Feliz as the owner of the S.S. MASTER ELIAS, claims that Feliz became obligated to perform the charter by force of Dynamic's having substituted the S.S. MASTER ELIAS in place of the S.S. WANDERLUST to perform the charter, and that thereby Feliz

is liable to TAMSA for breach of the charter;

the fifth, naming District as the owner of the S.S. AGIA IRENE, claims that District became obligated to perform the charter by force of Dynamic's having substituted the S S. AGIA IRENE in place of the S.S. MASTER ELIAS to perform the charter, and that thereby District is liable to TAMSA for breach of the charter;

the sixth, naming Preveza as the owner of the S.S. THEONYMPHOS TINOU, claims that Preveza became obligated to perform the charter by force of Dynamic's having substituted the S.S. THEONYMPHOS TINOU in place of the S.S. AGIA IRENE to perform the charter, and that thereby Preveza is liable to TAMSA for breach of the charter.

*The Two Motions for Arbitration*

Following the filing of the libel on September 20, 1965, four of the respondents, Dynamic, Potomac, Feliz and Preveza, appeared through the same proctors. They have not yet answered the libel. However, on October 27, 1965, the said four respondents filed a motion for a stay of all proceedings under the libel and for an order directing the parties to proceed to arbitration pursuant to 9 U.S.C. §§ 3 & 4. On October 28, 1965, the respondent Potomac filed a petition and a motion for an order to compel TAMSA to proceed to arbitrate the dispute and to have the court appoint an arbitrator for TAMSA, if it fails to do so.

## IS THERE A GENUINE ISSUE AS TO THE IDENTITY OF THE CONTRACTING PARTIES?

*TAMSA's Position*

TAMSA's proctors argue (Memorandum Of Law In Opposition To Respondents' Motion, p. 3):

"The threshold issue is which, among the five respondents, were parties to the Charter as principals or as agents for undisclosed or partially disclosed principals. Stated another way, the issue is with which of the five respondents did libelant have a charter.

This is an issue which can be decided only by the Court and not by arbitrators."

## Respondents' Position

The respondents contend that all of the credible evidence proves beyond doubt that, in signing the charter and other documents, Dynamic acted only as agent for the owners of the S.S. WANDERLUST; that Potomac, as the owner of that vessel, was Dynamic's principal and the real party in interest to the charter; that there is no genuine issue as to who are the parties to the charter; and, therefore, there is no sound reason for delaying the arbitration that is expressly provided for in clause "41" of the charter.

## The Controlling Statutory Provision

The Arbitration Act explicitly imposes upon the court the duty to determine the issue of "the making of the agreement for arbitration." (9 U.S.C.A. § 4.) The statute further provides:

"If the making of the arbitration agreement * * * be in issue, the court shall proceed summarily to the trial thereof. * * * [I]f the matter in dispute is within admiralty

jurisdiction, the court shall hear and determine such issue."

## The Controlling Decisions

■ Whether a person ostensibly signing as agent was, in fact, a real party to the arbitration agreement or whether a person not a signatory was nevertheless a party—that is, a question about the identity of the actual contracting parties—is encompassed within the statutory issue of "the making of the arbitration agreement." If that issue is found to be genuine, after the court has examined the record, the court must summarily order a trial of that issue.[2] Instituto Cubano De Estab., Etc. v. The SS THEOTOKOS, her engines, etc. and Transocean Oil Corporation and Transworld Marine Transport Corporation, 153 F.Supp. 85 (S.D.N.Y.1957) (ordering trial of the issue), 155 F.Supp. 945 (after trial) (hereinafter "Instituto").

The facts of Instituto closely resemble the basic situation now before the court. A charter party had been entered into by the shipper of cargoes of molasses [the charterer] to have the SS THEOTOKOS carry the cargoes from Cuba to ports of the United States. The charter

---

**2.** Almacenes Fernandez, S. A. v. Golodetz, 148 F.2d 625, 161 A.L.R. 1420 (2d Cir. 1945) held that "To make a genuine issue entitling" the party raising the question "to a trial" under § 4 of the Arbitration Act (9 U.S.C.A. § 4), that party must take an "unequivocal" position and produce "some evidence * * * to substantiate" that position. Almacenes cited Radio City Music Hall Corporation v. United States, 135 F.2d 715 (2d Cir. 1943), where a summary judgment had been granted and the court (per Learned Hand, J.) discussed the meaning of "genuine issue" within the context of Fed.R. Civ.P. 56. In Almacenes, the court concluded that there had been a failure to raise "a genuine issue," which was equated with "a substantial issue."

Where it indisputably appeared that the charterer of a vessel agreed to arbitrate with the vessel owner whoever he might turn out to be, the charterer's claim that he was entitled to a preliminary trial to determine the vessel's ownership was held to be "frivolous and without substance"

and to be an issue that would be determined in the arbitration proceeding itself. Dover Steamship Co. v. Summit Industrial Corp., 148 F.Supp. 206, 209 (S.D.N.Y. 1957).

A special procedure prescribed by the arbitration agreement itself (e. g., a binding ex parte arbitration if one party refuses to arbitrate) may require that the issue of whether a person was a party to the contract of charter should be postponed until after the completion of the arbitration proceedings. A/S Ganger Rolf v. Zeeland Transportation, Ltd., 191 F.Supp. 359 (S.D.N.Y.1961).

For a situation in which the court ordered a preliminary trial of "the contested issue"—whether a corporation not a party to the arbitration agreement was bound thereby under a successor clause, as the successor of an original signatory which discontinued business—see Office Employes Intern. U., Local 153, AFL-CIO v. Ward-Garcia Corp., 190 F.Supp. 448 (S.D.N.Y.1961).

was signed, in behalf of the vessel, by Transworld Marine Transport Corp. "As Agents for Owners of the good Liberian Steam Tank Vessel named 'Theotokos'." This form of qualification appeared in the body of the charter and in the subscription. The charter did not identify the vessel owners by name. The charter had in it a provision for the arbitration of disputes.

The shipper filed a libel against the S.S. THEOTOKOS, Transocean Oil Corporation ("Transocean") and Transworld Marine Transport Corporation ("Transworld") to recover damages for shortages in cargoes allegedly shipped by the charterer and carried by the vessel and the respondents Transocean and Transworld.[3] The charterer-libelant subsequently served a written demand for arbitration on each of the respondents. Respondent Transocean designated its arbitrator but respondent Transworld "refused to arbitrate on the ground that it had executed the charter party as agent for Transocean, the owner of the vessel, and 'hence was not a party to the charter party and is not bound by the arbitration provision contained therein.'" (153 F.Supp. at 86.)

District Judge Dawson pointed out (153 F.Supp. at 86):

"Transworld Marine now contends that Transocean is the owner of the vessel and that it acted merely as agent for Transocean. The Manager of the libelant, who signed the charter party on its behalf, submitted an affidavit in which he states: 'At the time I signed the charter party and the two addenda I had no knowledge or information that Transocean Oil Corporation was the owner of the S.S. Theotokos, and to the best of my knowledge, no other agent or representative of Instituto had any information to that effect.'

\* \* \* \* \* \*

Transworld raises an interesting point in this regard, i. e., can a party who signs a charter party as agent, but without designating the principal for whom he is acting, be compelled to arbitrate disputes arising out of the charter party. This issue will ultimately have to be decided but it cannot be adjudicated on this motion.

Respondent Transworld denies that it entered into the arbitration agreement or that it is bound thereby. Therefore the making of the arbitration agreement is in issue so far as Transworld is concerned. Certain issues of fact are pertinent to the determination of that issue, such as, for example, whether libelant knew the name of the owner of the vessel, or reasonably should have known it, and whether Transworld was acting for that owner in the scope of its authority, and whether libelant knew or should have known the principal on whose behalf Transworld was executing the charter party.

Since the making of the charter party by Transworld is in dispute, and these questions of fact are presented, this issue must be put down summarily for trial. 9 U.S.C. § 4."

After the trial, the court made the findings of fact and conclusions of law set forth in Judge Dawson's opinion, reported in 155 F.Supp. 945. Judge Dawson held that "the charter party is an agreement between libelant and the steamship Theotokos and Transocean Oil Corporation, and directs that the arbitration proceed between those parties. The Court concludes that Transworld Marine Transport Corporation is not a party to the charter party nor bound to arbitrate under the provisions thereof." (155 F.Supp. at 948.)

In summarizing the trial evidence,[4] Judge Dawson alluded *inter alia* to the

---

3. The respondents were represented by the same proctors who now represent TAMSA herein.

4. In *Instituto*, as in the present case, the charterer endeavored "to secure a financially responsible party" and sought "to ·

following facts (155 F.Supp. at 946–947):

"We have, therefore, a situation where the charter party was entered into by Transworld as agent for the owners of the ship, but without identifying on the document the name of the owners. It is undisputed that Transworld was not the owner \* \* \*.

Certainly the documentary evidence is undisputed that at the time libelant signed the charter party it knew that it was dealing with Transworld, as agent for the owner of the ship, and not with Transworld as the owner of the ship. There is no proof that libelant knew the name of the owner of the ship; on the other hand there is no evidence that there was any attempt to hide or disguise the name of the owner of the ship, and the name of the owner of the ship could have been learned very easily by those means used in the maritime industry, such as Lloyd's Shipping Index, or through the Deputy Commissioner of Maritime Affairs of Liberia at his office in New York City. Furthermore, there is no evidence that the libelant was seeking to secure a commitment by anyone other than the owner of the ship or sought more than to bind the ship by the charter party."

As to the question of law involved, Judge Dawson said (155 F.Supp. at 947–948):

"The question in this case, therefore, is whether the principal was disclosed by identifying the principal as the owner of the ship without giving the name of the owner. Nowhere does the law specifically require that the name of the principal

must be disclosed; rather, it requires that the 'identity' of the principal must be disclosed. If the identity can be disclosed by description, as well as by name, then undoubtedly there was disclosure of the identity of the principal in the present case. 1 Mecham, Agency, § 1412 (2d ed. 1914). 'The identity of the principal may be disclosed by description as well as by name, as where the agent made a contract "for the owners" of a ship named.' \* \* \*

\* \* \* It was quite clear that Transworld executed the instrument as agent and the principal was identified and described as the owner of the vessel.

In maritime contracts such description is sufficient to identify the principal for whom the agent is acting. See Hudson Trading Co. v. Hasler & Co., Inc., D.C.S.D.N.Y. 1926, 11 F.2d 666, 667, wherein the court said:

'It seems to me that the test, particularly in a maritime case, is not whether a principal is named, but rather whether a principal is identified. \* \* \*

'To say that "Hasler & Co., Inc." are acting "as agents for owners of the steamship Lake Forney, of Portsmouth, N. H., \* \* \*" identifies the principal beyond peradventure.'

Thus where a bill of lading showing the name of the vessel was signed by Kerr Steamship Co., Inc., Agents, the court held that there was sufficient identity of the principal. Wichita Falls Motor Co. v. Kerr S.S. Co., 1926, 160 La. 992, 107 So. 777, 778. See also Strachan

---

hold" the vessel owners' agent "on the charter party on the ground that it signed as agent for an undisclosed principal, and that it is, therefore, personally liable on the charter party." (155 F. Supp. at 946–947.) In the case at bar, the charterer's (TAMSA's) proctor alleg-

es "all available evidence indicates that Potomac Steamship Corp. is a defunct corporation with no assets. Therefore, it is a matter of paramount concern that the party or parties bound by the charter be identified." (Hickey opposing affidavit, p. 2.)

Shipping Co. v. Alexander Eccles Co., 5 Cir., 1928, 25 F.2d 361."

*Has TAMSA Raised a Genuine Issue about the Identity of the Other Contracting Parties?*

TAMSA does "not disclaim knowledge of the record ownership" of the S.S. WANDERLUST. TAMSA defines the issue in these words: "The issue here is whether, under all the facts and circumstances, the Owner of the WANDERLUST [Potomac] was the true principal in this transaction or whether Dynamic was in fact the true principal or whether some other unidentified or unknown party was the principal and Dynamic therefore was an agent for an undisclosed principal."

TAMSA concedes that Dynamic signed the May 27, 1964 charter party as agent for the owners of the S.S. WANDERLUST; that Potomac was the record owner of that vessel; and that various other vessels owned as of record by corporations other than Dynamic and Potomac, were utilized to perform the first three voyages under the May 27, 1964 charter.

TAMSA, however, challenging the seemingly plain meaning of these facts, asserts that they evidence only "formal and record arrangements"; that "the identity of the principal" cannot be determined "from the Charter or otherwise"; that "all indications point to the fact that Dynamic was pulling the puppet strings either on its own behalf, as principal, or as agent for some undisclosed principal, probably not one of the present respondents."

Aside from such of the foregoing statements that are merely conclusory and argumentative, TAMSA points to the following facts as circumstantial proof of its thesis that Dynamic has manipulated corporations, vessels and agreements in order to conceal the real, financially responsible principal, whose identity is a puzzle to be unravelled at a full hearing:

1. Feliz (the record owner of the S.S. MASTER ELIAS), District (the alleged owner of the S.S. AGIA IRENE) and Macedonian Steamship Corporation (the purchaser of the S.S. WANDERLUST in July, 1964) had the same address, viz, "c/o Dynamic Shipping, Inc., 80 Broad Street, New York, N. Y." This is said to be some evidence of common ownership and/or control by or through Dynamic, acting either as principal or agent.

2. The respondents have been "acting through the same proctors." This is said to be further evidence of some undefined community of interest.

3. In a New York State Supreme Court proceeding involving a dispute (about demurrage and freight) between Dynamic and TAMSA arising out of the second voyage, Dynamic verified a petition (on April 15, 1965) in which it stated explicitly (a) that it was acting "as Agents for *Owners of the SS AGIA IRENE*" and (b) that Dynamic and TAMSA had entered in a charter party on May 27, 1964 "whereby the petitioner [Dynamic] chartered *the SS AGIA IRENE and other vessels* to the respondent [TAMSA]." (Emphasis supplied.) TAMSA argues that these statements by Dynamic show that it acted as agent for the owner of the SS AGIA IRENE who was the real party to the May 27, 1964 charter in privity with TAMSA, and that the charter covered "the SS AGIA IRENE and other vessels." TAMSA's point is that Dynamic seems to wear and doff different hats to suit the exigency of the moment.

4. The agency agreement between Potomac and Dynamic (Exhibit K attached to the Rallis moving affidavit) is "not proof of Dynamic's authority to enter into the Charter in question on behalf of Potomac" because, whereas the agreement is dated "February 11, 1964," Article 6 of that agreement recites that it was signed on "February 11, 1965."

5. The fixture memoranda (agreements) entered into by Potomac with the owners of the two substituted vessels used on the first two voyages required Potomac to pay to the owners of those two vessels the same amount of

freight that Potomac would receive from TAMSA under the May 27, 1964 charter. As to the third voyage, Potomac was required to pay to the owners of the S.S. THEONYMPHOS TINOU more than it would earn under the May 27, 1964 charter with TAMSA. Thus, according to TAMSA, Potomac deliberately occupied the peculiar (and suspicious) position of making no profit out of the charter party. TAMSA argues: "The acid test of who was the real party in interest will be who ultimately stood to gain or lose under the Charter in question. This does not appear from the present papers * * *."

6. TAMSA challenges the credibility of statements that "Dynamic's relationship was made clear to libelant [TAMSA] from the beginning * * * [in] several conversations with libelant's New York representatives," when it was pointed out "that Dynamic was not the vessel owner or the principal" in the charter. TAMSA alludes to the circumstances that the persons who are supposed to have had the conversations referred to are not named and that, in fact, the charter "was negotiated and concluded between brokers."

7. TAMSA also calls attention to these alleged facts: Potomac has no listing in the current New York Telephone Directory; Potomac is no longer carried in Lloyds Register as owning any vessels; Potomac "is now dormant or inactive * * * and, in all probability, bereft of any assets"; and "it is curious" that the respondents, "acting through the same attorneys, join in a motion which attempts to throw the liability on the defunct Potomac Steamship Corporation."

The respondents vigorously dispute TAMSA's sinister inferences. In support of the respondents' position, they cite the following circumstances:

1. Potomac is the only respondent who, at any time, has been "in contractual privity with the libelant [TAMSA]."

2. The date "February 11, 1965," appearing in Article 6 of the agency agreement between Dynamic and Potomac "is a typographical error" that was discovered only recently. The correct date is "February 11, 1964."

3. "It was originally intended that the S.S. WANDERLUST would perform these voyages, however, due to other commitments of that vessel, Dynamic, acting as agents for her owners, arranged for the substitution of other vessels to perform said voyages."

4. The respondents admit "that Dynamic did act as agent for the owners of the S.S. AGIA IRENE and the S.S. MASTER ELIAS" but claim that "Dynamic, in arranging for the substitution of the S.S. WANDERLUST by another vessel was nevertheless acting as an agent for the owners of the S.S. WANDERLUST."

5. As to Potomac's charter arrangements with the owners of the three substituted vessels which precluded any profit for Potomac, the respondents argue: "The fact that there were 'back-to-back charters' merely indicates that Potomac, for business reasons of its own, felt that it should charter another vessel to perform the particular voyage in question."

6. The respondents explain Dynamic's petition filed in the New York Supreme Court as follows: "The representation that Dynamic had 'chartered the AGIA IRENE and other vessels to the respondent' was, in fact, a representation which is not inconsistent with the respondents' position, i. e., that Dynamic, acting as agents for Potomac, chartered other vessels for the purpose of substituting the S.S. WANDERLUST in the performance of the original charter."

7. The respondents admit "that Potomac does not presently own any vessels" but claim "it is not a defunct corporation and is presently * * * in good standing."

## CONCLUSIONS

1. The record before the court is far from a model of clarity. The affidavits by attorneys not possessing personal knowledge of the facts combine

conclusions and legal arguments with evidentiary facts. Some of the critical features of the case are shrouded in ambiguity. To the extent that the record is susceptible of close analysis, the extracted factual data warrants the conclusion that the issue raised by TAMSA is not fictitious or unreal.

2. The ends of substantial justice require that the issue concerning the identity of the contracting parties shall be determined at an early trial to be held before this court at a date to be fixed by the court after conferring with counsel.

3. Within three days after the date of the filing of this opinion, counsel shall settle an order in accordance with the views expressed herein formulating precisely and succinctly the issues to be tried.

4. Pending the outcome of such trial, disposition of the petition and motion for arbitration (65 Ad. 1079) and of the motion for a stay of the proceedings under the libel (65 Ad. 946) shall be held in abeyance.