In the Matter of the arbitration between
**HIDROCARBUROS y DERIVADOS,**
**C.A., Petitioner,**

**and**

Costas M. LEMOS, C. M. Lemos & Co., Ltd., Triton Shipping Inc., Albatross Shipping Co., S.A., Boreas Shipping Co., S.A., Celestial Shipping Co., S.A., Clipper Shipping Co., S.A., Eastwind Shipping Co., S.A., Fairwind Shipping Co., S.A., Galaxy Shipping Co., S.A., Hercules Shipping Co., S.A., Home Shipping Co., S.A., Legend Shipping Co., S.A., Mermaid Shipping Co., S.A., Moonbeam Shipping Co., S.A., Moonflower Shipping Co., S.A., Moonlight Shipping Co., S.A., Moonstone Shipping Co., S.A., Moontide Shipping Co., S.A., Nile Shipping Co., S.A., Northwind Shipping Co., S.A., Planet Shipping Co., S.A., Rea Shipping Co., S.A., Seacrest Shipping Co., S.A., Seahawk Shipping Co., S.A., Seaspray Shipping Co., S.A., Skydrome Shipping Co., S.A., Southwind Shipping Co., S.A., Starcluster Shipping Co., S.A., Stardust Shipping Co., S.A., Sunbeam Shipping Co., S.A., Sunflare Shipping Co., S.A., Sunlight Shipping Co., S.A., Sunrise Shipping Co., S.A., Tradewind Shipping Co., S.A., Virgo Shipping Co., S.A., Westwind Shipping Co., S.A., Windward Shipping Co., S.A., Nereus Shipping, S.A., and Compania Espanola de Petroleos, S.A., Respondents.

No. 77 Civ. 613–CSH.

United States District Court,
S. D. New York.

Dec. 6, 1977.

Supplemental Memorandum and Order
April 12, 1978.

Baker & McKenzie, New York City, for petitioner; Lawrence W. Newman, Janna H. J. Bellwin, New York City, of counsel.

Burke & Parsons, New York City, for respondents Nereus Shipping, S.A. and Triton Shipping, Inc.; Raymond J. Burke, Thomas A. Dillon, Jr., Stephen P. Kyne, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This petition to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, 4, draws the parties into a second round of litigation preliminary to the resolution of commercial disputes by arbitrators. Arbitration agreements are intended to avoid litigation, not breed it. That salutary purpose is not always achieved.

The present petition is brought by Hidrocarburos y Derivados, C.A. ("Hideca") to compel alleged beneficial and corporate owners of vessels to participate in, and be bound by, a pending arbitration arising out of a maritime contract of affreightment ("COA"). To place the petition in context,

the contract, disputes and prior litigation must be summarized.

### I.

#### A. The Contract

The COA, dated at New York, N.Y. on January 21, 1971, called for the ocean carriage of approximately 600,000 tons of crude oil per year for three years. The designated parties were Nereus Shipping, S.A. "as agents for owners" of vessels to be nominated, and Hideca as "charterer". Hideca was obligated to furnish the cargoes which the vessels would carry, at freight rates specified in the COA.

By addendum to the COA, Hideca's performance was guaranteed by Compania Espanola de Petroleos, S.A. ("Cepsa").

#### B. The Disputes

The first vessel to perform under the COA, M/T ASIATIC, was nominated on October 26, 1971. In the words of the Second Circuit when the case reached that Court: "All went well until the Arab oil embargo in October, 1973, when the market rate for oil cargoes fell precipitously."[1] Nereus claims that by July 24, 1974, Hideca was in default in the payment of freight, demurrage and other charges under the COA totalling $1,236,845.67. During that month, amid barrages of charges and counter-charges, performance under the COA ceased, after seventeen liftings.

Nereus demanded arbitration with Hideca to recover the $1,236,845.67 allegedly owing in respect of voyages that had been performed under the COA. Nereus also demanded arbitration with Cepsa on its guaranty of Hideca's performance of the COA, this on the theory that Hideca had wrongfully ceased that performance. Hideca demanded arbitration with Nereus, claiming that Nereus had breached "the entire charter party"; had wrongfully withheld a vessel from Hideca; had improperly obtained an attachment order against

1. *Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 970 (2d Cir. 1975), *cert. den.*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387.

Hideca; and had wrongfully invoked the Cepsa guaranty. Damages were claimed in an unstated amount.

## C. *The Prior Litigation*

After preliminary legal skirmishings which need not be recounted in detail,[2] this Court (Stewart, D. J.) held that Cepsa was bound as Hideca's guarantor to arbitrate Nereus' claim; and ordered that the Nereus/Hideca and Nereus/Cepsa arbitrations be consolidated, before a panel of five arbitrators.[3] On appeal the Second Circuit affirmed, although it modified Judge Stewart's direction as to the selection of the five arbitrators. Under the Court of Appeals' mandate, each of the three parties appointed an arbitrator, who were then to choose two additional arbitrators by unanimous action. Judge Medina concluded his opinion for the Court:

"We believe that it is important that each party have its own representative, a provision which also appears in the contract, and thus we agree with Judge Stewart's selection of a five-man panel. We feel this will best accommodate the newly ordered consolidation and the original contract provisions.

"It is our hope that the parties will now get down to business." 527 F.2d at 975–976.

We turn to the business which next engaged the parties' energies.

## II.

Following Nereus's unsuccessful petition for certiorari, a five-man panel of arbitrators was selected in accordance with the Court of Appeals' procedure. Four arbitrators are resident in New York; Cepsa's arbitrator resides in Geneva, Switzerland. Efforts were made to schedule hearings during January-March of this year, but the arbitrators and counsel could not agree on a mutually convenient date. Before hearings

commenced, Hideca filed the present petition.

Hideca's petition was prompted by an exchange of letters between counsel. On November 15, 1976, during efforts to schedule the first hearings, counsel for Hideca wrote to counsel for Nereus as follows:

"In connection with the forthcoming hearings of the above-captioned arbitration matter, we wish to clarify certain matters relating to the parties who will be represented and be bound by the award ultimately made by the arbitration panel. It is our understanding that, in your capacity as counsel for Nereus Shipping, S.A., as Agent for Owners under the charter party dated January 21, 1971 with Hidrocarburos y Derivados, C.A. as Charterer, you will represent and participate in the arbitration proceedings on behalf of the following principals of Nereus Shipping, S.A."

The letter then lists an individual, Costas M. Lemos; C. M. Lemos & Co., Ltd.; Triton Shipping, Inc.; and 35 additional corporations. The letter concludes:

"If you will not be representing any of these persons in the arbitration and/or you have any objection to the inclusion of any of those persons or parties in the proceedings, please notify the undersigned on or before November 22, 1976 so that we may take appropriate and timely legal action to compel arbitration with said persons." [4]

That letter received the following brisk response from counsel for Nereus, under date of November 22:

"We acknowledge receipt of your letter dated November 15, 1976. The only parties which will be represented and participate in the arbitration *and be bound by such arbitration award* will be the three parties listed in the above caption, which

the Owner, one by the Charterer, and one by the two so chosen."

---

**2.** *Id.* at 971–972.

**3.** The COA, Clause 24, provided for arbitration in New York by a panel of three arbitrators, "consisting of one arbitrator to be appointed by

**4.** Ex. B to petition.

were the only parties to the Contract of Affreightment." (emphasis added).[5]

Hideca's petition, filed on February 8, 1977, seeks to compel the individual and corporations referred to in counsel's letter of November 15, 1976 (Ex. B) to participate in, and be bound by, the consolidated arbitration.

Hideca's position, in essence, is that Lemos and the additional corporate respondents are the beneficial or record owners of the vessels for whom Nereus executed the COA "as Agents for owners"; and that, to avoid inconsistency of results and achieve finality, they should be made parties to the arbitration. Specifically, the theories underlying the petition are that Nereus acted as agent for the "Lemos fleet" of tankers, the vessels which were to perform the COA; that Costas M. Lemos is the "beneficial owner" and dominating influence over the corporate owners; that C. M. Lemos & Co., Ltd. and Triton Shipping, Inc. in effect acted as "owners" in respect of the vessels under the COA; and that the other corporate respondents are the registered owners of the vessels comprising the "Lemos fleet".

Hideca served its petition on Triton in New York, on the theory that this accomplished service over all additional respondents. Counsel for Nereus dispute this, and have filed papers in opposition on behalf of Nereus and Triton only. Without abandoning its contention that service over the other respondents had been obtained, Hideca undertook service of process upon them in England. The Lemos companies share offices at 92 Fenchurch Street in London. Hideca retained a solicitor of the Supreme Court of England and Wales to make personal service upon Lemos and all additional corporate respondents at that address. This was accomplished on March 16, 1977.[6]

Hideca followed sanctioned procedures of service outside the state.[7]

The original return date on Hideca's notice of motion to compel arbitration, which accompanied the petition, was February 18, 1977. In accordance with this Court's response to an *ex parte* inquiry, counsel for Hideca, by letter dated March 10, 1977, wrote to the Lemos respondents (individual and corporate) in London, advising that the return date of February 18 was no longer controlling; specifying March 28, 1977 as the date by which answering papers should be served; and advising the additional respondents that a failure to make timely response to the petition might result in default. Copies of this letter were sent to New York counsel for Nereus and Triton, and for Cepsa.

The additional respondents, individual and corporate, who were served in England in the manner described have made no response to the petition; nor have they contested the Court's jurisdiction in any manner. It is appropriate, in these circumstances, to note the default of these parties, which I hereby do.

■ The consequences of that default lie, in large measure, within the Court's discretion. In the case at bar, these defendants will not be heard to contest the Court's jurisdiction *in personam*. In addition, certain factual allegations in the petition will be considered binding upon these respondents, no effort having been made to controvert the allegations. However, Nereus and Triton filed timely papers in opposition to the petition, which attack its underlying merits. Those arguments will be considered as put forward on behalf of all respondents, and the Court's resolution of the questions posed by the present record

---

5. Ex. C to petition.

6. Affidavit of Ruth P. Meyler.

7. Since the Federal Arbitration Act does not specify the manner in which service of a petition is made, the Federal Rules of Civil Procedure apply. Rule 81(a)(3). Rule 4(d)(7) incorporates applicable state procedures. Hideca proceeded in accordance with N.Y.C.P.L.R.

§§ 313, 311 and 308(2). The state's jurisdiction over nonresident respondents arises out of N.Y. C.P.L.R. § 302(a)(1), the COA having been executed in New York. In addition, the contract calls for arbitration in New York, which renders parties to the contract amenable to suit here. *Trade & Transport, Inc. v. Directorate General of Commerce, Saigon,* 310 F.Supp. 463 (S.D.N.Y.1969).

will inure to the benefit or burden of all parties, as the case may be.

Against this background, we turn to the merits of the petition.

### III.

The respondents' first objection to the petition is that it is barred by laches. Respondents contend that, in the two and one-half year period between Hideca's demand for arbitration, in August 1974, and the present petition, "Hideca has never even suggested, much less contended, that the parties to the arbitration should be other than Nereus, Hideca and Cepsa." [8] Respondents point to the declaration of the Court of Appeals "that it is important that each party have its own representative",[9] and argue that the inclusion of thirty-eight additional parties in the arbitration, at this late date and without "each party [having] its own representative" on the arbitration panel "would be grossly prejudicial to such respondents." [10]

■ There is no substance to respondents' argument based on the doctrine of laches. Laches is composed of two elements: unreasonable delay by a party, resulting in prejudice to its adversary. See, generally, *Larios v. Victory Carriers, Inc.*, 316 F.2d 63 (2d Cir. 1963).

■ While there has been considerable delay since the disputes arose, most of the elapsed time was devoted to litigation of whether or not there should be a consolidated arbitration. It appears from the motion papers that Hideca proposed consolidation and Nereus resisted it,[11] which Nereus had every right to do; but the resulting litigation and attendant delay, terminating only when the Supreme Court denied certiorari on June 14, 1976, can hardly be ascribed solely to Hideca.

I further find that Hideca raised the question of these additional respondents'

participation in the arbitration in a timely manner. It was not until the Supreme Court denied certiorari, in June of 1976, that the parties concerned in the COA knew that a five-man arbitration panel would resolve disputes. By November, 1976, it appears that the five-man panel had been selected; the precise dates of appointment do not appear in the papers; the delay is not unreasonable, in view of the demands upon the time of distinguished arbitrators; and in any event there is nothing in the record to indicate that delay in completing the panel should be ascribed to any particular party. As we have seen, on November 15, 1976 counsel for Hideca asked counsel for Nereus, which had signed the COA as "Agent for owners", to confirm that at the arbitration hearings they would be representing not only Nereus, the agent, but its principals. Counsel for Nereus responded in the negative on November 22, and the present petition was filed less than two months later, before any arbitration hearings had been held.

Respondents stress that at no time during the prior litigation did Hideca argue that Nereus's principals should be made parties to the arbitration. This factor is also stressed in connection with respondents' argument, based upon the doctrine of the "law of the case".[12] I find no merit to this contention. During the prior litigation, the parties were focusing primarily on the question of consolidation *vel non*, and the composition of the panel if consolidation was ordered. But Hideca was at all times aware, as indeed Nereus must have been aware, that Nereus had signed the COA as "Agents for owners". The letter of Hideca's counsel of November 15, 1976 may fairly be regarded as an inquiry, on their part, into the authority of Nereus to claim and defend in the arbitration on behalf of their principals, the vessel owners, so that the owners would be bound by the result. That

---

**8.** Respondents' brief, at p. 11.

**9.** See p. 164 *supra.*

**10.** Respondents' brief, at p. 12.

**11.** Newman reply affidavit, Ex. D.

**12.** See Point IV, *infra.*

inquiry was entirely legitimate,[13] and in the circumstances I hold that it was timely made. In the light of the response of counsel for Nereus, explicitly raising the threat that the vessel owners would contend they were *not* bound, Hideca was bound to take some action, and it proceeded with reasonable dispatch.

I find, in sum, that Hideca was not guilty of unreasonable delay in petitioning for the present relief.

On the question of prejudice to Nereus, none is shown. No arbitration hearings had been held at the time of the petition, so the inclusion of additional parties, if directed, will do no violence to proceedings which were under way. If respondents' contention is that the addition of these parties would require the appointment of additional arbitrators, the short answer is that it would not. If the petition is granted, the arbitration panel will remain precisely as it is, with the arbitrator previously appointed on behalf of Nereus also acting as the arbitrator for the additional parties. Nothing in the Court of Appeals' prior decision requires a different result.[14]

In these circumstances, I reject the defense based upon laches.

### IV.

■ Much that has been said in respect of laches applies to respondents' defense based upon the doctrine of law of the case.

In the prior litigation, neither the litigants nor the courts were focusing upon the issue of substance raised by the present petition. The prior emphasis was, as noted, upon consolidation and the makeup of a consolidated panel; whether or not Cepsa was subject to arbitration as Hideca's guarantor was also vigorously litigated. The language of neither Judge Stewart nor the Court of Appeals should be taken out of context, so as to suggest resolutions of questions that were simply not before them. The Court of Appeals was well aware that

Nereus had signed the COA as "an agent for owners of various vessels", 527 F.2d at 968. If it is fair for Nereus to say that Hideca, at no time in those prior proceedings, suggested that the vessel owners should be parties to the arbitration, it is equally fair for Hideca to respond that at no time in those proceedings did Nereus suggest that the vessel owners would not be bound by the arbitration result. That latter suggestion first surfaced in the letter of counsel for Nereus of November 22, with predictable results.

In the circumstances of this case, the "law of the case" doctrine has no useful office to perform. The doctrine, as evolved in the federal courts, provides "that where a court has enunciated a rule of law to be applied in a case at bar, it establishes the law which will normally apply to the *same issues* in subsequent proceedings in that case." *Petersen v. Federated Development Co.*, 416 F.Supp. 466, 473 (S.D.N.Y.1976) (emphasis added). The doctrine, which is neither inexorable nor absolute, is based on a policy of judicial economy:

> "'[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.' *Zdanok v. Glidden Company-Durkee Famous Foods Div.*, 327 F.2d 944 (2d Cir.), cert. den., 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)."

The issues raised by the present petition were neither raised nor resolved in the prior proceedings, and accordingly are not barred by the law of the case doctrine.

### V.

Respondents' preliminary objections having been rejected, we arrive at the merits of the petition.

■ The law of agency lies at the heart of the parties' contentions. Common law principles of agency apply to maritime contracts, and the resolution of obligations

---

**13.** Compare *Martran Steamship Co. v. Aegean Tankers Limited*, 170 F.Supp. 477, 478 (S.D.N.Y.1959).

**14.** See Point VIII, *infra*.

arising under the Federal Arbitration Act. *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 537 (2d Cir. 1975).

Agency concepts must be considered because of the parties' differing views of the relationships created by the COA. Nereus argues that additional parties are unnecessary because "Nereus was a principal, or at most an agent for an undisclosed principal, which has the same legal effect", namely, visitation of liability on the contract to the third party (Hideca),[15] citing Restatement of Agency 2d (1958), § 322 (hereinafter "Restatement"). Hideca argues that, in view of the negotiations leading up to the COA, Nereus's principals were "sufficiently identified and 'disclosed' for the purposes of the charter party",[16] and that their presence in the arbitration is essential.

Nereus is identified in the preamble to the COA as "Agents for owners (hereinafter called the 'Owner') of the vessel per nomination." Nomination of the vessels which would actually perform the COA was provided for in Clause 3:

"Owners to give Charterers 45 days notice of intended nomination of each vessel loading under this contract and shall further give 30 days notice of definite nomination. Charterers shall within five (5) days of definite nomination stipulate the loading port and voyage orders. In addition, Owners shall give Charterers estimated program one (1) month prior each calendar quarter for that quarter."

Nereus signed the COA "as agents for owners." The actual owner or owners of the vessels that would perform are not named in the contract. The permissible sizes of performing vessels are specified in Clause 2. That clause also requires that they be classed "highest ABS or equivalent", which permits classification by societies other than the American Bureau of Shipping.

This Court has commented previously that "the conduct of the charter party business through agents, unnamed principals, a multiplicity of corporations, and a variety

of foreign flag ships" can give rise to problems. *Tubos De Acero De Mexico, S.A. v. Dynamic Shipping Inc.*, 249 F.Supp. 583, 584 (S.D.N.Y.1966) (Herlands, D. J.). The case at bar is illustrative.

■ It is readily apparent that Nereus's self-characterization as principal "or at most an agent for an undisclosed principal" cannot be accepted. The Restatement, § 4(3), defines "undisclosed principal" as follows:

"If the other party has no notice that the agent is acting for a principal, the one for whom he acts is an undisclosed principal."

In the case at bar, the COA proclaimed the status of Nereus as "Agents". Thus it cannot be said that Hideca had "no notice that the agent is acting for a principal." Restatement § 322, cited by respondents as governing the COA, is equally inapplicable; it provides:

"An agent purporting to act upon his own account, but in fact making a contract on account of an undisclosed principal, is a party to the contract."

Nereus did not purport "to act upon [its] own account," at least not entirely.

The remaining key definitions in Restatement § 4 are:

"(1) If, at the time of a transaction conducted by an agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity, the principal is a disclosed principal.

"(2) If the other party has notice that the agent is or may be acting for a principal but has no notice of the principal's identity, the principal for whom the agent is acting is a partially disclosed principal."

Hideca contends that the additional parties respondent were the *disclosed* principals under the COA, pursuant to § 4(1). The assertion is initially somewhat startling, since Hideca has been litigating, and preparing to arbitrate, with Nereus for over two years; and if Nereus signed the COA as agent for *disclosed* principals, it may itself be under

---

**15.** Respondents' brief, at p. 13.

**16.** Petitioner's reply brief, at 7.

no liability on the contract. *Instituto Cubano De Estabilizacion Del Azucar v. The SS. Theotokos,* 155 F.Supp. 945 (S.D.N.Y.1957); Restatement § 320; but compare § 328, Comment b.

■ This contention of disclosed principals is based upon affidavits showing the course of the negotiations leading up to the COA. The proof consists of the broker's telexes [17] and an affidavit of Hideca's president, Rafael Tudela R.

The broker's telexes, exchanged between the broker Long and Hideca in Caracas, Venezuela, begin on January 7, 1970 with Hideca's expression of interest in a three-year contract of affreightment starting in July, 1971.[18] Long replied that day:

".  .  . we trying to get Lemos to offer in the meantime Marcona is prepared to offer on three year contract of affreightment persian gulf west options including teneriffe, spain and trinidad." [19]

Long pressed both "Lemos" and "Marcona" for offers; on January 15 he telexed Hideca:

"have been trying all morning contact mr Tudela as have meeting arranged 1500 today with ship owner Lemos discuss your contract but have been unsuccessful locating him stop" [20]

Hideca's replies express continuing interest, and a request for information "immediately after Lemos meeting." [21]

On January 18 Long telexed Hideca that he "had meeting Lemos today hopeful will obtain offer within next few days." [22] That hope materialized. On January 25 Long telexed Hideca:

"Lemos willing offer you contract affreightment 500/600000 tons per annum three years starting Oct Nov rate W125

stop He intends use vsls 70/150000 tencentum cargo with max arrival drafts about 58/06 feet can you make arrangement work this tonnage and if you can please authorize basis W120 when expect close 125" [23]

This was followed on January 26 by Long's telex putting forward a firm offer:

"Hideca behalf Lemos offer firm reply 1000 New York Wednesday contract affreightment three years basis 600000 longtons tencentum per year crude and/or dirty petroleum product  .  .  ."

After setting forth further details of the offer, Long concluded:

"We must not lose this owner who absolutely first class." [24]

The COA was then concluded, dated January 27.[25]

The Tudela affidavit recites that, during the negotiations evidenced by these telexes:

"Mr. Long was in touch with me and my associate, Jose Ignacio Llopart, regularly by telex and telephone concerning conversations and meetings he was having with Mr. Costas M. Lemos, the owner of the ships to be the subject of the contract of affreightment."

Tudela's affidavit concludes:

"Mr. Long repeatedly passed on to me or to Mr. Llopart what Mr. Lemos' position was in the negotiations, and I or Mr. Llopart passed on to Mr. Long for communication to Mr. Lemos the position of HIDECA in those negotiations. There was no question at any time but that the ships to be provided under the contract of affreightment were to be tankers from the Lemos Fleet owned by Costas M. Lemos. As far as my understanding was

---

17. Ex. A–1 through A–13 of Newman reply affidavit. The broker involved in the negotiations was S.A. ("Huey") Long, of the ship brokerage firm of Long, Quinn & Boylan Co., Inc. of New York. This company, whose cable name is "Longtanker", specializes in charters and contracts of affreightment for tank vessels.

18. Ex. A–1, A–2.

19. Ex. A–3. "Marcona", it is clear from the context, is another shipowner.

20. Ex. A–6.

21. Ex. A–7.

22. Ex. A–8.

23. Ex. A–11.

24. Ex. A–12.

25. Ex. A to petition.

concerned, Nereus Shipping, S. A., the party which ultimately signed the contract of affreightment, was acting as agent for corporate or other nominal owners of ships in the Lemos Fleet having the characteristics and specifications provided for in the contract of affreightment. It was my understanding that these ships were in reality beneficially owned by Mr. Costas M. Lemos, who was in fact making all the final decisions."

The evidence summarized above is uncontroverted on the present record.

Before performance of the COA ceased, nine vessels actually lifted cargoes and three others were, at one time or another, proposed to be used. As listed in contemporaneous, recognized maritime industry publications, the registered owner of each of these 12 vessels was one or another of the additional corporate respondents; and the agent for each of these corporations was identified as "C. M. Lemos & Co., Ltd.", at 92 Fenchurch Street, London.[26]

On this evidence, the Court finds that at the time of contracting the parties expressly contemplated that the COA would be performed by vessels of the "Lemos fleet", a phrase that may be defined as vessels owned by corporations for whom C. M. Lemos & Co., Ltd. was listed as agent. That contemplation clearly appears from the broker's telexes; it was implemented by the vessels actually nominated to perform. It is also evident that Lemos participated himself in the negotiations.

The present petition raises this issue: which of these entities, if any, should be regarded as "owners" of the performing vessels, for whom Nereus acted as agent in the contracting, and thus should be viewed as principals to the contract and bound by the arbitration clause?

Hideca contends that each of these entities, corporate and individual, should be regarded as principals under the COA: the registered corporate shipowners because of their legal title to those vessels which performed the contract and might have performed the balance;[27] C. M. Lemos & Co., Ltd. and Triton because of their participation in and control of performance; and Lemos individually because of his "beneficial ownership" of the corporations and participation in the contracting. These relationships, Hideca argues, were substantially revealed at the time of contracting, so as to give Hideca notice "of the principal's identity" within Restatement, § 4(1).

Hideca relies upon *Instituto Cubano, supra*, and *Hudson Trading Co. v. Hasler & Co.*, 11 F.2d 666 (S.D.N.Y.1926). But those cases are distinguishable, in that each of them involved a charter party signed by a company "as agents for owners" of a specified, named vessel, whose owner was readily ascertainable from shipping registers. In the case at bar, Nereus signed "as agents for owners" of unnamed vessels; the COA would be performed by vessels to be nominated at a future date. It is evident that, within the context of principal and agent, somewhat different considerations arise.

The contract in *Orion Shipping & Trading Co. v. Eastern States Petroleum Corporation of Panama, S. A.*, 284 F.2d 419 (2d Cir. 1960), *cert. den.*, 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705, cited by respondents, more closely resembles the contract at bar; but the Second Circuit's holding does not squarely address the present issues. *Orion*

---

**26.** *1972 Tanker Register*, published by H. Clarkson & Son, London, England, at pp. 368–369 (see affidavit of Janna H. J. Bellwin). Courts treat such industry publications as reliable indicia of ownership. *Instituto Cubano, supra*, at 947. See also Lloyd's registers, attached as exhibits to affidavit of Hugh McGovern, for more recent years, which confirm the "Lemos fleet" connection of the vessels in question.

**27.** With a view to prospective performance, Hideca seeks to add corporate shipowners in the "Lemos fleet" whose vessels had not been nominated for performance prior to termination, but might have been in future, since their vessels conformed to the COA's size specifications. Hideca's reply papers concede that the following respondents may be dropped, since their vessels did not conform: Mermaid; Moonlight; Moontide; Nile; Rea; Sunbeam; Sunflare; Sunlight; Sunrise. See Newman reply affidavit at ¶ 9.

involved a long-term contract of affreightment for ocean carriage of petroleum, which was signed by Orion Shipping & Trading Co. "as agents for chartered owners . . . of tonnage to be nominated without restriction of flag." Judge Swan summarized the essence of the contract:

> "By the terms of the contract Orion was to supply vessels and Panama was to supply petroleum products at the rate of 10,500 barrels per day (with a permissible 10% variance) at agreed freight rates." 284 F.2d at 420.

Panama having ceased performance, Orion demanded arbitration. Panama argued that since Orion signed as agent, a summary trial was necessary (9 U.S.C. § 4) to determine whether Orion was a principal or an agent and, if the latter, its authority to sue on behalf of its principals. The Court rejected the argument, since if Orion was an agent its principals were undisclosed, and "an agent for an undisclosed principal can enforce the terms of his contract and needs no authority from his principal to do so." *Id.*, at 421, citing Restatement §§ 321, 322.[27A]

Nobody quarrels with that proposition; but it does not resolve the issues in the present case, where (a) the Lemos fleet was identified as the source of the performing vessels; and (b) Nereus has taken the position that it and it alone will be bound by the arbitration. Upon analysis, it is clear that the issues at bar are entirely different from the issue in *Orion*. Hideca does not question Nereus's standing or authority to claim arbitration on behalf of the shipowner principals. That was the *Orion* issue; it does not arise here. The issues here arise out of the assertion of counsel for Nereus that *only* Nereus is a party to the COA, and only Nereus will be bound by the arbitration. None of the cases cited by either party deals directly with the pertinent

agency questions which arise from this form of contract. In fairness, the Court's research has not disclosed any closer authority. But the recognized agency concepts may be applied to the contract at bar without undue difficulty.

The status of the corporate shipowners, Lemos individually, and the other corporate respondents (C. M. Lemos & Co., Ltd. and Triton Shipping, Inc.) will be discussed in that order.

## VI.

### A. *The Corporate Shipowners*

■ The corporate registered owners of the vessels, *prima facie* at least, hold title to them, possess choses in action arising out of contracts for their use, and are liable for breaches of such contracts. Hence we begin the analysis with them.

At the time of contracting, nobody knew which particular vessels would perform the contract. I have found that the parties contemplated use of the Lemos fleet; but any vessel of appropriate size could be nominated; there were many of them; and each corporation owned only one vessel, a not uncommon phenomenon in shipping.[28] Thus it cannot be said that, at the time of contracting, Hideca had notice of the identity of the particular corporate shipowners. In consequence Restatement § 4(1) does not apply to the corporate shipowners; none of them was a "disclosed principal" at the time of contracting. The Restatement definition which comes closest to the present facts is that of § 4(2): at the time of contracting Hideca knew Nereus was acting for a principal or principals, but (at least with respect to corporate principals) did not know their identity. Even here, however, the definition does not fit exactly, since § 4(2) would appear to assume a presently existing, if

---

**27A.** For the reasons stated at pp. 168–169 *supra*, this Court would regard the definition of "partially disclosed principal" as bearing a closer resemblance to the contract than "undisclosed principal." However, the distinction is not material to the point at hand.

**28.** See Gilmore & Black, *The Law of Admiralty* (2d ed. 1975) at p. 841. The authors, discussing the *Torrey Canyon* litigation, observe:

> "In the shipping context, the 'true owner' (Union), instead of operating its own fleet under its own name, sets up dummies (like Barracuda) to hold title to each of its ships."

unknown, principal, whereas under the COA's scheme of operation the corporate shipowners were only *potential* principals until their vessels were nominated. I do not find in the law of agency any recognition of the "potential principal."

However, once Nereus nominated a vessel to load a cargo, pursuant to Clause 3 of the COA, her corporate owner became known. While it is generally said that the pertinent knowledge of a principal's existence or identity is that which exists at the time of transaction, so that subsequent disclosure "has no bearing upon the relationship created at the time of the transaction", Restatement § 4, Comment c, the rule is usually applied to simple contracts (see illustrations to the Comment); in the rather unusual circumstances of the contract at bar, I hold that corporate shipowners whose vessels were actually nominated became disclosed principals, to the extent of that particular voyage, at the time of nomination. With that exception, the corporate shipowners cannot be regarded in law as principals of or parties to the COA.

### B. *Lemos as an Individual*

Hideca characterizes Lemos as the "beneficial owner" of his several corporations. Buttressing that characterization with the uncontroverted evidence of Lemos' personal participation in the negotiations, Hideca argues that he is a disclosed principal in the contract.

Lemos is a party to the contract and the arbitration clause only if he should be regarded, in his individual capacity, as the vessel "owner" for whose benefit the contract was executed. But to reach that conclusion the Court must disregard the corporations in which legal title to the vessels reposed. That is to say, Lemos is bound to arbitrate only if the corporations were his *alter egos*, and their veils should be pierced.

It is of course well settled that the mere fact that a party did not sign an arbitration agreement does not mean that he cannot be held bound by it. In *Interocean Shipping Co. v. National Shipping and Trading Corp.*, 523 F.2d 527, 539 (2d Cir. 1975), the Second Circuit stated generally:

"Ordinary contract principles determine who is bound. In an appropriate situation, the corporate veil may be pierced and a party may be held bound to arbitrate as the signatory's alter ego. *Fisser v. International Bank*, 282 F.2d 231, 233–34 (2 Cir. 1960)."

While *Interocean Shipping Co.* recognizes the principle of corporate veil piercing, in practice a particular and stringent showing is required. This is demonstrated by *Fisser v. International Bank,* an opinion by Judge Hincks which the Second Circuit cited in *Interocean.* In *Fisser,* a maritime contract of affreightment was signed by German coal importers and Allied Transportation Corporation, a Liberian corporation. The vessel interests having breached the contract of affreightment, which contained an arbitration clause, the coal importers sued under the Federal Arbitration Act to enforce the arbitration clause not only against Allied, but also against the International Bank, on the theory that Allied was the *alter ego* of the Bank. The Second Circuit reviewed the facts, and held that they did not "justify disregard of Allied's separate existence." *Fisser* at 237. Summarizing the relevant principles, Judge Hincks quotes with approval a New York State case, *Lowendahl v. Baltimore & Ohio R.R. Co.,* 247 App.Div. 144, 287 N.Y.S. 62, *affirmed,* 272 N.Y. 360, 6 N.E.2d 56:

" 'Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:

'(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

'(2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

'(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.' [247 App. Div. 144, 287 N.Y.S. 76.]" 282 F.2d at 238.

These requirements were reaffirmed in *Interocean,* in which arbitration was sought to be enforced not only against a named charterer, Hellenic International Shipping, S.A., but also against National Shipping & Trading Corporation, a closely related company. The Second Circuit, holding that National was not required to arbitrate, stated:

> "In view of the close familiar relationship between Hellenic and National, this might be said to be a tempting case to hold National bound by the arbitration clause. But even if we viewed Hellenic as having no mind of its own, i. e., that it was completely dominated by H. T. and National, there is no evidence in the record before us that such control was used to perpetrate a fraud or something akin to fraud. Such a showing is a sine qua non to holding a non-signatory bound by an arbitration agreement. *Fisser v. International Bank,* supra, 282 F.2d at 238–40." 523 F.2d at 539.

In the case at bar, the evidence adduced by Hideca on its motion papers is clearly insufficient to demonstrate the *Fisser* elements in respect of Lemos and his corporations. The evident fact that Lemos participated personally in the negotiations is, of course, not decisive; in view of his beneficial interest in the corporations, which Hideca itself stresses, such participation is not surprising.[29]

The relationship between Lemos and his corporations, and the existence or absence of the *Fisser* elements, can be developed only during an evidentiary hearing, preceded, in case of need, by appropriate discovery. The question, insofar as Lemos's obligation to arbitrate is concerned, relates to "the making of the arbitration agreement or the failure, neglect or refusal to perform the same", Federal Arbitration Act, 9 U.S.C. § 4; the statute requires that, if such issues are raised, "the court shall proceed summarily to the trial thereof."[30] *Ibid.* See, generally, *Tubos De Acero De Mexico, S.A. v. Dynamic Shipping Inc.,* 249 F.Supp. 583 (S.D.N.Y.1966).

The respondents contend that, in the circumstances of this case, no preliminary or threshold hearing to resolve these questions is necessary prior to arbitration. Reliance is placed upon *Orion, supra,* which, as noted, demonstrates the status of Nereus to enforce the shipowners' claims but does not resolve other pertinent questions; and also upon Judge Carter's endorsement opinion of March 19, 1974 in *Cochin Refineries Ltd. v. Triton Shipping Inc., et al* (S.D.N.Y. 74 Civ. 216).

In *Cochin,* which involved a number of the same parties respondent, the charterer under a contract of affreightment commenced an action at law against Triton Shipping Inc., which signed the contract "as agents for owners", and also against various ship-owning corporations, C. M. Lemos & Co. Ltd., Nereus Shipping S.A. and Lemos individually. Triton, the named party to the arbitration, moved to stay proceedings pending arbitration; other corporate defendants and Lemos in his individual capacity moved to dismiss the complaint. The plaintiff contended that the question of which entities were parties to the contract, and bound to arbitrate, should be tried first, in advance of arbitration. Judge Carter disagreed:

> the basic structure of corporation law to hold that Allied, merely because it elected the respondent's officers to be its officers, forfeited its entity and deprived its parent-stockholder of immunity from liability for its contracts." *Fisser, supra,* at 238.

---

29. "The proofs do not show that in doing these things, or others transpiring subsequent to Allied's organization, executives of the respondent were directly meddling with the management of Allied's affairs: it is equally plausible to ascribe the acts to the same individuals as Allied's executives participating in a manner normal and usual for stockholders and directors of an independent corporation. It would, of course, be a complete disregard of

30. Since the contract is maritime and within admiralty jurisdiction, the trial is non-jury.

"While the question of whether any one is a party to an arbitration agreement is for the court to determine, *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673 (2d Cir. 1973), this contract clearly binds plaintiff and defendant Triton Shipping to arbitrate their disputes.

"There is no reason to proceed as plaintiff suggests to first determine whether defendants other than Triton are undisclosed principals which Triton represents. The principals are plaintiff and Triton. If plaintiff prevails against Triton at arbitration, and the latter is unable to satisfy the judgment award, plaintiff's action against the other defendants will still be pending. It will be time enough at that time for a trial to determine whether these defendants are bound. Cf. *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299 (2d Cir. 1963)."

With great respect, I cannot accept this resolution, at least in the circumstances of the present case. The statute quite clearly mandates resolution of such questions prior to the arbitration hearing and award. Indeed, it has been held that a party which fails to raise such questions in advance of arbitration pursuant to § 4 of the Arbitration Act cannot raise them subsequently, upon a motion to confirm the award pursuant to § 9.[31] Given that state of the law, and Nereus's flat disclaimer that any party other than itself would be bound by the arbitration award, Hideca is bound to ask for such an evidentiary hearing at this time, and entitled in law to receive it.

The Court would, of course, be reluctant to see further delay in the arbitration hearings. Accordingly certain practical suggestions will be offered to the parties under Point VII, *infra*, which may permit the hearings to go forward at the present time, while protecting the interests of all concerned.

### C. *C. M. Lemos & Co., Ltd. and Triton Shipping Inc.*

As to these corporate respondents, Hideca alleges, in essence, that they so participated in the management and performance of the vessels as to constitute ownership. In addition, Hideca points out that in attachment proceedings commenced against Hideca in the courts of Morocco in July of 1974, in connection with claims arising out of the COA, C. M. Lemos & Co., Ltd. identified itself as "the owner and operator of the vessel MAJESTIC", one of the performing vessels.[32]

Conceptually, one corporation may be the *alter ego* of another corporation. *Interocean, supra, Fisser, supra.* Whether these particular corporations, by virtue of the *alter ego* theory, or by virtue of their own direct participation in the performance of the COA, should be regarded as "owners", also pose issues of fact which cannot be resolved on the present papers. Thus, if it proves necessary to conduct an evidentiary hearing prior to the arbitration, the status of these corporations will be addressed as well.

### D. *The Status of Nereus*

In conclusion on this subject, it is appropriate to point out that, whatever the

---

**31.** *Matter of Arbitration between Philippine Bulk Shipping, Inc. and International Mineral & Chemical Corp.*, 1973 A.M.C. 2385, 2387 (S.D. N.Y.) (not officially reported). In *Cochin* Judge Carter postulated that the identity of undisclosed principals would become meaningful only if the charterer won the arbitration and could not collect its damages from Triton, which signed the contract. Nereus urges that concept here. But Hideca, confronted by Nereus's disclaimer, is entitled to a greater degree of protection. If Hideca loses the arbitration and pays an award, it is entitled to an assurance that such payment satisfies the principals as well as Nereus as agent. That is particular-

ly true if the arbitrators award damages in a lesser amount than was claimed against Hideca. Hideca should not bear the risk of a subsequent claim by principals who have expressly declined to be bound by the arbitration; and yet that is the precise risk which arises from Nereus's disclaimer of last November. Comparable considerations apply to Cepsa, which supports Hideca's petition. The questions must be resolved now, unless the parties can stipulate to a different procedure. See Point VII, *infra*.

**32.** Affidavit of E. Reda Thabet.

ultimate status of these additional entities may prove to be, Nereus is a party to the contract, and has all the rights and obligations of a party. The Court is, of course, mindful of the rule stated in Restatement, § 328:

"An agent, by making a contract only on behalf of a competent disclosed or partially disclosed principal whom he has power so to bind, does not thereby become liable for its nonperformance."

However, Comment b recites:

"In many cases the agent is a party to the contract made by him on behalf of a disclosed principal and, as such, is responsible for its performance."

In the case at bar, the obligation of nominating vessels under Clause 3 of the COA fell squarely upon Nereus. In the event that Hideca sustains its claim of wrongful termination of the contract by the vessel interests, Nereus would be liable under that principle.

## VII.

■ For the foregoing reasons, the petition is granted as to those corporate shipowners whose vessels performed voyages giving rise to claims which are pending in arbitration.

No basis exists for making any other corporate shipowner a party to the arbitration. A corporate shipowner whose vessel performed without dispute or claim, while a party to the contract *pro tanto,* is not involved in the arbitrable disputes. Corporate shipowners whose vessels were not nominated are not parties to the contract, either for the purpose of asserting claims or defending them. The petition is denied as to corporate shipowners in those latter two categories.

Decision on the petition as to C. M. Lemos, C. M. Lemos & Co., Ltd., and Triton Shipping Inc. is reserved pending trial of the pertinent issues, which the Court will schedule at a conference counsel are directed to attend on December 28, 1977 at 10:00 a.m. in Room 2904.

In advance of that conference, the Court directs counsel to consider a stipulation along either one of the following lines:

(1) A stipulation that the "owners" under the COA, in addition to Nereus as "agents for owners", will be bound by the arbitration award. This would amount, in effect, to withdrawal of Nereus's disclaimer of last November which, it is fair to say, provoked the present petition. Counsel would have to consider how "owners" could be defined, within the context of such a stipulation, so as to meet the practical requirements of Hideca and Cepsa without compromising the respondents' views of corporate integrity. Language along the lines of "owners as their interests may subsequently appear" might be considered.

(2) Alternatively, a stipulation that the unresolved questions of which additional entities, if any, are parties to the COA be held in abeyance, pending determination of the arbitration. Respondents would presumably be required to signify their express agreement that, notwithstanding the wording of the Arbitration Act, such issues could be resolved within the context of a motion to confirm the award under § 9 or a motion to vacate under § 10.

The ingenuity of counsel may, of course, suggest other stipulations.

Absent such an agreement, trial of the issues raised will precede the arbitration.

## VIII.

■ Finally, the Court holds that the addition of additional parties, concerned in the vessels as "owners", does not require any change in the present five-man panel of arbitrators. The arbitrator previously appointed on behalf of Nereus will act as arbitrator for any additional parties which may join the proceedings as the result of this petition.

I recognize that, as the result of the prior litigation in this matter, Hideca and Cepsa have separate arbitrators. I am mindful of the Second Circuit's observation, in that context, that "it is important that each party have its own representative, a provision which also appears in the contract",

527 F.2d at 975. That latter reference is to Clause 24 of the COA, which provides for a board of three arbitrators, "consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen."

It was entirely appropriate to direct that Hideca, the Charterer, and Cepsa, its guarantor by virtue of an addendum to the contract, have separate arbitrators. The relationship between Hideca and Cepsa is not that of agent and principal; and the claims the vessel interests put forward against these two companies are different. That is to say, under the terms of the guaranty the vessel interests can claim only against Hideca for the $1,236,845.67 allegedly owing prior to termination of the contract; their demand against Cepsa is limited to the recovery of damages by reason of the failure to perform voyages for the balance of the cargo to be shipped under the COA.[33]

By way of contrast, to the extent that the present petition brings additional parties into the arbitration, it is only because such additional parties may fairly be viewed as "owners", within the context of a contract and prior litigation which gives to vessel-owning interests representation by one arbitrator. In these circumstances, the arbitrator previously appointed on behalf of Nereus, as "agents for owners", may fully protect the position by extending his representation to such additional parties. The alternative would be to appoint an additional arbitrator for each additional party, an entirely unworkable concept which nothing in the prior litigation requires.

Settle order in conformity with this opinion, on three (3) days' notice.

It is So Ordered.

## SUPPLEMENTAL MEMORANDUM AND ORDER

By memorandum opinion dated December 6, 1977, familiarity with which is assumed, the Court granted in part Hideca's petition to compel arbitration and directed the parties to settle an order implementing the opinion. No such order has yet been entered. In the interim the parties and the Court have explored together the possibility of agreeing on the terms of the order, with particular reference to avoiding a pre-arbitration evidentiary hearing while at the same time preserving all parties' rights. While the effort was worthwhile, it is now apparent that no such agreement can be reached, and the Court therefore enters the order set forth below.

While the Court would have preferred to see the parties begin addressing the merits before the arbitrators, deferring a hearing and judicial determination of what entities, corporate and individual, are parties to the contract (see prior opinion at p. 175), compelling Second Circuit authority militates to the contrary.

Hideca moved to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, which provides in part:

"If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."

In the case at bar, the issue is whether certain corporations and one individual, Costas M. Lemos, should be regarded as "owners" under the contract of affreightment containing the arbitration clause, in addition to Nereus Shipping, S.A., which signed "as agents for owners." The resolution of that issue will determine which entities will be bound by the arbitration award and which will not.

The question is one for the Court to determine, not the arbitrators. *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.,* 312 F.2d 299 (2d Cir. 1963). A threshold issue is whether that determination should be made before the arbitration, within the context of a petition to compel arbitration under § 4; or after the arbitration, within that of a motion to confirm the award under 9 U.S.C. § 9. *Orion, supra,* strongly suggests the former. In that case

---

**33.** Dillon affidavit at ¶¶ 13–15.

Signal Oil & Gas Company, as guarantor of the performance of Eastern Panama, was alleged to be the corporate alter ego of Eastern Panama, although Orion, the other party to the contract, did not test that theory in proceedings to compel arbitration under § 4. The arbitrator purported to hold both Eastern Panama and Signal liable, the latter on its guarantee. The district court held, and the Court of Appeals agreed, that the arbitrator had exceeded his powers in affixing liability upon Signal as guarantor. Orion sought to preserve the benefit of the arbitrator's action by moving to confirm the award against Signal under § 9, on the theory that Signal was Eastern Panama's alter ego. The Second Circuit rejected the effort in this language:

"It may well be, as Judge Dawson indicated below, that Eastern Panama is thoroughly dominated by Signal, and that Signal is properly accountable on an 'alter ego' theory. But we hold that an action for confirmation is not the proper time for a District Court to 'pierce the corporate veil.' The usual office of the confirmation action under 9 U.S.C. § 9 is simply to determine whether the arbitrator's award falls within the four corners of the dispute as submitted to him. This action is one where the judge's powers are narrowly circumscribed and best exercised with expedition. It would unduly complicate and protract the proceeding were the court to be confronted with a potentially voluminous record setting out details of the corporate relationship between a party bound by an arbitration award and its purported 'alter ego'. Our conclusion does not in any way impugn the soundness of the reasoning in the *Fisser* case [*Fisser v. International Bank,* 2 Cir., 282 F.2d 231], which arose in the quite distinguishable context of an action to compel arbitration under 9 U.S.C. § 4, rather than to confirm.

"As Judge Dawson concluded, our holding does not preclude Orion from prose-cuting its action, still pending, against Signal as guarantor of Eastern Panama's obligations. Nor does it preclude Orion from bringing a separate action against Signal to enforce the award against Eastern Panama, invoking the 'alter ego' theory. But an action to confirm the arbitrator's award cannot be employed as a substitute for either of these two quite distinct causes of action." 312 F.2d at 301.

■ I read *Orion* and *Fisser v. International Bank,* 282 F.2d 231 (2d Cir. 1960), cited in *Orion,* to require that the alter ego theory, and any other theory determinative of the identity of parties to an arbitration agreement, be tested by an action to compel arbitration under § 4, prior to the arbitration hearings.[1] While this conclusion necessarily delays those hearings, there is much to be said for determining who are the parties to the arbitration before the arbitrators hear the merits.

For the reasons stated in the Court's memorandum of December 6, 1977 and in this supplemental memorandum, it is

■ ORDERED that the petition of Hidrocarburos y Derivados, C.A. to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, 4, be and the same hereby is granted in respect of those corporate shipowners whose vessels (1) were nominated to perform under the COA, and (2) are involved in disputes arising out of the COA. Those corporate shipowners and the vessels concerned are as follows:

| Owner | Vessel |
| --- | --- |
| Skydrome Shipping Co., S.A. | POETIC |
| Galaxy Shipping Co., S.A. | MAJESTIC |
| Clipper Shipping Co., S.A. | TROPIC |
| Planet Shipping Co., S.A. | ATHENIC |
| Seaspray Shipping Co., S.A. | PLATONIC |
| Stardust Shipping Co., S.A. | SCENIC |

While the petition to compel arbitration is granted as to these corporations, their participation in the arbitration will be limited

1. The requirement relates only to proceedings brought under the Federal Arbitration Act. As *Orion* points out, a separate action may always be brought against a guarantor. However, those circumstances are not present in the case at bar, since Hideca's claims against the vessel interests are limited to the Act.

to claims and disputes involving their respective vessels.

IT IS FURTHER ORDERED that the arbitrator previously appointed on behalf of Nereus Shipping, S.A. will act as arbitrator on behalf of these additional parties, so that no alteration or enlargement of the arbitration panel is required.

IT IS FURTHER ORDERED that the petition to compel arbitration with corporate shipowners whose vessels were not nominated to perform voyages under the COA be, and the same hereby is, denied. This paragraph does not apply to respondents Costas M. Lemos, C. M. Lemos & Co., Ltd., and Triton Shipping Inc., which are dealt with in the subsequent paragraph.

IT IS FURTHER ORDERED that the parties shall proceed summarily to trial before the Court, pursuant to 9 U.S.C. § 4, to determine whether respondents Costas M. Lemos, C. M. Lemos & Co., Ltd., and Triton Shipping Inc. are parties to the arbitration agreement and have failed to perform the same. The issues will be resolved by the Court prior to commencement of the arbitration hearings. A reasonable time for pre-trial discovery will be permitted.

IT IS FURTHER ORDERED that the parties are to report to Room 2904 on June 20, 1978 at 1:30 p. m. for a status conference and the fixing of a trial date, if none has been sooner scheduled.