**Catherine S. TUNIS, Plaintiff,**

**v.**

**CORNING GLASS WORKS, Defendant.**

**No. 86 Civ. 1074 (RLC).**

United States District Court,
S.D. New York.

Sept. 16, 1988.

Catherine S. Tunis, Washington, D.C., pro se.

Shearman & Sterling, New York City (John J. Madden, Jr., of counsel), Reed Smith Shaw & McClay, Pittsburgh, Pa. (Scott F. Zimmerman, Mark A. Fontana, of counsel), for defendant.

## OPINION

ROBERT L. CARTER, District Judge:

Plaintiff Catherine S. Tunis brings this action for employment discrimination against Corning Glass Works ("Corning"), alleging sexual harassment and retaliation. Corning seeks summary judgment on the ground of laches and on the further ground that it did not discriminate against plaintiff in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.*

## LACHES

### A. Background

Corning employed plaintiff at its plant at Fallbrook, New York, as a Process Engi-

neer in Glass Technology from April 1, 1976 until September 17, 1976. On June 26, 1976, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), and mailed a copy to the New York State Division of Human Rights. The EEOC notified Corning of plaintiff's charge, pursuant to 42 U.S.C. § 2000e–5(b), at least as early as November 1, 1976.

■ Plaintiff signed a Complaint in the Division of Human Rights on September 20, 1976.[1] On October 31, 1979, following its investigation of plaintiff's charges, the Division of Human Rights recommended the matter for public hearing. A state administrative law judge (ALJ) took evidence in the case on four hearing dates between November 17, 1981 and September 23, 1982, and issued his report, finding no discrimination, on February 28, 1983. Plaintiff and the Division of Human Rights filed objections to the ALJ's report. By Order of the Commissioner dated April 6, 1983, plaintiff's Complaint in the Division was dismissed.[2]

The EEOC adopted the findings of the Division of Human Rights and issued a Right to Sue Letter which plaintiff received on October 1, 1985. On February 5, 1986, plaintiff filed this action.[3]

B. Discussion

■ In appropriate cases, the equitable defense of laches may be asserted against a Title VII claimant. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1975); *see Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 373, 97 S.Ct. 2447, 2457, 53 L.Ed.2d 402 (1977). *Cf. Ass'n Against Discrimination in Employment v. Bridgeport*, 647

F.2d 256, 272 n. 15 (2d Cir.1981) (leaving open question whether laches defense applies to Title VII cases), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). To establish laches, the defendant must prove both that the plaintiff delayed unreasonably and inexcusably in asserting her claim and that the defendant suffered "substantial" prejudice as a result. *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 65 (2d Cir.1983); *Ass'n Against Discrimination*, 647 F.2d at 272 n. 15; *Hidrocarburos y Derivados, C.A. v. Lemos*, 453 F.Supp. 160, 166 (S.D.N.Y.1977) (Haight, J.). Mere delay, without more, does not amount to laches. *Prudential Lines*, 704 F.2d at 65.

■ This court has placed a strict construction on the element of unreasonable and unexcused delay in the context of Title VII suits. *Allen v. Avon Products, Inc.*, 45 Employ.Pract.Dec. (CCH) ¶ 37,830, at 51,238 (S.D.N.Y. Feb. 22, 1988) (Kram, J.) [available on WESTLAW, 1988 WL 18841]; *Cosgrove v. Sears, Roebuck & Co.*, No. 81 Civ. 3482 (CSH), slip op. (S.D.N.Y. May 26, 1982) (Haight, J.). *Accord Staples v. Avis Rent–A–Car System, Inc.*, 537 F.Supp. 1215, 1219 (W.D.N.Y.1982). Title VII claimants are "not required to litigate prior to the termination of the EEOC's investigation and attempts at conciliation," *Allen*, 45 Employ.Pract.Dec. at 51,238 (citing *Staples*, 537 F.Supp. at 1219), and it is not unreasonable *per se* for an aggrieved party to delay filing an action in federal district court pending the outcome of the administrative process. To the contrary, such a party "should be commended rather than criticized for attempting to stay out of court." *Cosgrove*, slip op. at 12.

1. Plaintiff's Charge of Discrimination was amended on March 12, 1977, and supplemented on February 12, 1979.

2. Plaintiff instituted state judicial proceedings to review the decision of the Division of Human Rights, but withdrew her appeal in order to preserve her federal right of action under Title VII. Unreviewed state administrative proceedings have no preclusive effect on Title VII claims. *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 796, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986). *Cf. Kremer v. Chemical Const. Corp.*,

456 U.S. 461, 466–67, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262 (1982) (relitigation of issue precluded where New York court affirmed agency finding of no discrimination on the merits).

3. By Endorsement dated March 25, 1987, the court denied Corning's first motion for summary judgment. That motion was premised on the fact that the complaint was filed more than ninety days after plaintiff's receipt of the Notice of Right to Sue.

The conviction to which these authorities give voice—that a litigant should not be penalized for pursuing administrative avenues of relief—is premised on the strong federal policy which favors the avoidance of private suits by encouraging claimants to rely on agency procedures. *Sangster v. United Air Lines, Inc.*, 438 F.Supp. 1221, 1228 (N.D.Cal.1977), *aff'd*, 633 F.2d 864 (9th Cir.1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981). *See, e.g.*, 42 U.S.C. § 2000e–5(f)(1) (mandating waiting period of 180 days between filing of charges with EEOC and filing private suit). Other courts, too, have recognized the importance of that policy, and the inequity of treating reliance on the administrative process as a lack of diligence. *E.g., Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 77 (3d Cir.1986); *Holsey v. Armour & Co.*, 743 F.2d 199, 211 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985); *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1532–33 (11th Cir.1984); *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1257 (5th Cir.1979), *rev'd on other grounds*, 619 F.2d 459 (5th Cir.) (en banc), *aff'd*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1980); *Fowler v. Blue Bell, Inc.*, 596 F.2d 1276, 1279 (5th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 671, 62 L.Ed.2d 648 (1980); *Patzer v. Board of Regents*, 577 F.Supp. 1553, 1556 (W.D. Wisc.1984), *rev'd and remanded on other grounds*, 763 F.2d 851 (7th Cir.1985); *Sangster*, 438 F.Supp. at 1228. *See gen'ly* Annot., Laches as Defense to Action under Title VII, 52 A.L.R.Fed. 218.

Nor do the cases Corning cites stand for a contrary principle. In *Cleveland Newspaper Guild v. Plain Dealer Publ. Co.*, 839 F.2d 1147, 1153 (6th Cir.1988) (en banc), the court recognized the "understandable" reluctance courts have shown to dismiss Title VII claims where delay was attributable at least in part to the EEOC, and limited the defense of laches to "rare cases."

*Whitfield v. Anheuser–Busch, Inc.*, 820 F.2d 243 (8th Cir.1987), is one such "rare case": there, the claimant sat on his rights for ten years after the conclusion of the EEOC hearing. *Id.* at 245. Similarly, in *Jeffries v. Chicago Transit Authority*, 770 F.2d 676 (7th Cir.1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986), the claimant took no action during a period of ten years between filing his charge with the EEOC and being issued a notice of right to sue. *Id.* at 678–79. The decision in *Garrett v. General Motors Corp.*, 844 F.2d 559 (8th Cir.1988), was based on the court's finding that plaintiff had "made insufficient inquiry [of the EEOC] between 1972 and 1984." *Id.* at 562.

By no means has the plaintiff at bar sat idly by as administrative proceedings dragged on; rather, she took an active part in the prosecution of her charges. Her affidavit lists over twenty occasions between 1976 and 1986 on which she made inquiry of the EEOC or the State Division of Human Rights regarding the progress of her case. Nor has cause been shown why the delay of five years in bringing the state charges to hearing should be laid at her door.

The element of prejudice is equally absent here. Corning admits that the hearing before the State Division of Human Rights was full and fair, Br. at 4, and that the testimony given at that hearing "is likely the best evidence of the events which culminated in [plaintiff's] discharge." *Id.* at 5 n. 2. Corning went to great lengths to make its defense at that hearing; indeed, it flew one witness in from Brazil. Thus, the claim of unavailability of witnesses, even if true,[4] is unimpressive. The transcript of the hearing preserves for trial all the testimony that Corning felt the need to present in its defense. In the event that one or more of the five witnesses who testified on

---

4. Of the eight witnesses whom Corning claims are unavailable, three testified "fully" at the state hearing, one is still employed by Corning, and one was still employed by Corning at the time of the hearing. Another one is retired and resides in South Carolina; retirement, however, does not by itself constitute unavailability. *Staples*, 537 F.Supp. at 1219. The remaining two are deceased or disabled, but were not called to testify at the state hearing, at which time they apparently were available. The court infers that their testimony is immaterial.

Corning's behalf has truly become unavailable, the transcript of his or her former testimony is admissible in this action. Rule 804(b)(1), Fed.R.Evid.

Corning's claim that documentary evidence relevant to its defense no longer exists is specious. "A party cannot assert the defense of laches merely because it has failed to preserve evidence despite knowledge of a pending claim." *Bernard*, 596 F.2d at 1249 (citing *American Marine Corp. v. Citizens Cas. Co.*, 447 F.2d 1328, 1330 (5th Cir.1971)). Corning was notified of the charges against it at least as early as November 1, 1976. "This prompt notice serve[d], as Congress intended, to give [Corning] an opportunity to gather and preserve evidence in anticipation of a court action." *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 372, 97 S.Ct. 2447, 2457, 53 L.Ed.2d 402 (1977).

Corning claims it did not preserve plaintiff's written reports, relevant time records, a production log book which plaintiff allegedly defaced, and output records. Those documents, however, were not even preserved long enough to be used at the state hearing. Moreover, the time records were not preserved despite the fact that they still existed in August, 1977; at that time, Corning management instructed an employee to review those records and to compile from them a record of plaintiff's work attendance. (Tr. at 315–25)[5] The subsequent loss or destruction of the original records cannot be attributed to delay.

## DEFENSE ON THE MERITS

### A. Background

At her hearing before the State Division of Human Rights, plaintiff testified that her job duties at Corning's Fallbrook plant brought her into various areas in which photographs of nude women were displayed. One wall, in particular, was entirely covered with pin-ups and similar pictures. On April 15, 1976, she complained to Charles Francik, the plant manager, about these pictures. In the course of a lengthy discussion, Francik made a number of personal and sexual comments inappropriate to the matter at hand, and addressed plaintiff as "dear" and "honey". Francik also insinuated that plaintiff was a troublemaker. (Tr. at 44) He ultimately agreed to have the pictures removed and to keep plaintiff's identity confidential.[6] Subsequently, some but not all of the offending materials were removed.[7]

It appears shortly to have become a matter of common knowledge at the plant that the pictures had been removed at plaintiff's behest.[8] A week after her meeting with Francik, plaintiff was taken aside by her immediate supervisor, Dennis Kauser, who told her he was "disturbed" that she had gone to Francik with her complaint instead of coming to him. (Tr. at 54) Kauser expressed his disapproval of "women's liberation," and made a thinly veiled threat to plaintiff's job security.[9] Other Corning employees made no secret of their annoyance over plaintiff's complaint; among them was another supervisor, who had been asked by Francik to remove a *Playboy* calendar from his desk. (Tr. at 58)

It was also apparently in response to that complaint that plaintiff became the subject of harassing whistling and cat-calls by groups of "trades," or hourly, employ-

5. "Tr." refers to the transcript of the hearing on plaintiff's complaint in the New York State Division of Human Rights.

6. Francik testified that it was plant policy since at least 1972 to remove sexually explicit materials from the plant when they were discovered. Tr. at 125. Nonetheless, he denied that he had promised plaintiff that her name would not be mentioned in connection with the removal of the pin-ups. *Id.* at 158.

7. Plaintiff testified that nude pictures were still to be found displayed in the Fallbrook plant when she was fired five months later. Tr. at 222.

8. Francik testified that he brought up the matter of the pictures at the next day's general management meeting. Tr. at 127.

9. Kauser, according to plaintiff, related to her what a previous employer of his had once told him: "there are alot of people out there in that plant that aren't doing so well but I won't have to fire any of them. I will just make it so bad for them that they will have to quit." Tr. at 57.

ees. Plaintiff lodged numerous complaints with Kauser, with Kauser's supervisor, Jack Stumpf, and with Francik, concerning this harassment. Stumpf told her that she was "enticing" the trades employees (Tr. at 228), or that she was "encouraging" them to harass her.[10] (Tr. at 265). Francik's response was, "Oh, you're going to get that. You got yourself into some hot water, honey." (Tr. at 60) Francik also told plaintiff, in the course of the same conversation, that she was very intelligent and had a very good chance of getting ahead in the company, but that "that is not the way to do it." (Tr. at 62)

In Francik's recollection, he informed the union representative of the trades employees of plaintiff's complaint about whistles and cat-calls, and told the union steward that it had to stop. (Tr. at 141) He took no subsequent action. Stumpf testified that he made the same request of both the steward and of Carlo Merletti, the supervisor in charge of the trades employees. (Tr. at 251–52) These actions were ineffectual, however, and plaintiff continued to be harassed many times each day up to her last day at Corning. (Tr. at 226)

In response to her continuing complaints, Stumpf met with plaintiff, Merletti and a union representative; no action issued from this meeting, allegedly because of plaintiff's inability to identify the particular individuals who were harassing her. (Tr. at 252–54) It appears, however, that management took no steps toward identifying the culprits.[11] In any event, management was unwilling to take disciplinary action against the offending employees. Stumpf told plaintiff, "[Y]ou don't really expect us to fire a man with a wife and family for something like that, do you?" (Tr. at 393) Francik also testified that

"there was no question of sanctions" against the harassers. (Tr. at 174)

Shortly before plaintiff became employed at Corning, the company had instituted a policy of substituting gender-neutral terms for its traditional job titles, e.g. "supervisor" for "foreman". A week before plaintiff started work, a memo on this topic was circulated to all division managers. Early on in her employment at Corning, plaintiff expressed her concern to Francik that supervisory personnel, with whom she was expected to work closely in order to learn her profession, continued to use the superseded gender-specific terminology. (Tr. at 135) Francik asked his personnel supervisor to issue a memorandum, but took no further action since he believed that habitual speech patterns were largely immune from rectification. (Tr. at 137–38)

When plaintiff pointed out to a supervisor that he was not using the approved terminology, Francik's response was not to ask the supervisor to be more careful, but to ask plaintiff "not to correct people". (Tr. at 145–46) The evidence of record on this motion lends itself to the inference that management's failure to follow through with its own policy put plaintiff in the untenable position of either attempting to ask her own supervisors to observe the policy or suffering the degradation of being told, in effect, that certain jobs were only for men.[12] As with her earlier attempt to have Corning comply with its policy of not permitting sexually explicit pictures in the workplace, this one led to acrimony.

Among a number of other kinds of harassment to which plaintiff testified she was subjected, see Tr. at 69–76, the most significant consequence of her outspokenness was her ostracism by the very personnel, a number of them at the supervisory

---

**10.** One of Stumpf's complaints about plaintiff's job performance was that, instead of spending more time with the "floor people" who could provide her with information pertaining to the source of manufacturing defects, she was "engaging in banter with the hourly people back and forth." (Tr. at 279)

**11.** Merletti, who supervised the trades employees, disclaimed any direct knowledge about the

harassing incidents, yet never questioned his employees about them. He was apparently satisfied by the fact that, when he told them to stop, no individual stepped forward and admitted that he had participated. Tr. at 376.

**12.** In fact, according to plaintiff, most job categories at the Fallbrook plant were filled exclusively by men or exclusively by women.

level, whose cooperation was essential to her job performance. Her own immediate supervisor, Kauser, after the late-April meeting at which he told her he was disturbed by her complaint to Francik, no longer provided her with the guidance which he had formerly given her. He began to ridicule her work without stating any reason for his dissatisfaction. (Tr. at 78–80) Stumpf at one point asked Kauser to give plaintiff more complete background concerning her assignments (Tr. at 242), but the supervisory relationship did not improve. Other supervisors, the senior department heads of other departments, objected to working with plaintiff "because of her attitude." (Tr. at 244–45) It normally would be expected that a junior engineer in plaintiff's position would work with the heads of other departments to learn her trade and collect the information on the glass-making process necessary to diagnose the causes of manufacturing defects. (Tr. at 244) Management took virtually no steps to rectify the refusal of the senior department heads to work with plaintiff; Stumpf, for instance, made it clear that it was up to plaintiff alone to "change her attitude and become more friendly with people necessary for her to do her job correctly." (Tr. at 246)

On the morning of September 17, 1976, Kauser informed plaintiff that he wanted to conduct a formal review of her job performance. The review was done later that same morning, and resulted in a rating that plaintiff felt considerably understated her actual job performance. On the basis of this review, Kauser told plaintiff that he would recommend her dismissal. Plaintiff was, in fact, dismissed that afternoon.

Corning provides essentially four grounds for having dismissed plaintiff. It is claimed, first, that she was frequently late for work, second, that she was not "friendly" and was unable to get along with other employees, third, that she was

disruptive, and fourth, that the quality of her analyses of production defects was low.

Plaintiff's hours were officially 8:00 a.m. to 5:00 p.m. Testimony before the Division of Human Rights indicated that plaintiff arrived at work after 8:00 three to five times a week during most of her term of employment. (Tr. at 315–25) Plaintiff testified, however, that when she arrived at 8:00 she was, on several occasions, unable to gain access to her office because Kauser or another individual had the key and had not yet arrived. She typically arrived at work between 8:15 and 8:20, which was not unusual for similarly situated employees and which allowed her sufficient time to prepare her report for the 9:30 production meeting. (Tr. at 401–2) Her supervisor indicated to her that tardiness was not a serious problem as long as she left herself enough time in the morning to prepare for that meeting.[13] (Tr. at 91)

Plaintiff's alleged reputation for unfriendliness appears to stem largely from her willingness to complain to Corning management when Corning policies were being ignored. Stumpf, for instance, did not first hear complaints about plaintiff's "attitude" until mid-June. (Tr. at 285) By that time, plaintiff had complained about offensive pictures posted throughout the plant; Francik had had many of those pictures removed, and had apparently let it be known that he was doing so at plaintiff's instance; plaintiff had been offended by the use of sex-specific job titles, which it was company policy no longer to utilize, and had complained of their use; and plaintiff had begun to suffer harassment at the hands of the trades employees. Despite her ostracism by many co-workers, however, plaintiff never refused to work with any Corning employee.[14] (Tr. at 293–94)

The claim that plaintiff was disruptive is grounded primarily in plaintiff's attempts to see Corning's policy of gender-neutrality in job titles implemented. Jeane Gauthier, the supervisor of the Tubing Department,

---

13. Plaintiff also testified that she rarely left work before 6:00 p.m., and often stayed until 8:00. (Tr. at 402)

14. Indeed, Corning management spent "some time looking within [the company] for possible openings that might better suit her background." Tunis Aff't, Attach. 8.

testified that plaintiff prolonged morning production meetings by her objections to the use of sex-specific job titles. He admitted, however, that these meetings only "sometimes" ran overtime, and when they did it was for reasons other than plaintiff's "disruptions". (Tr. at 356) Plaintiff also is alleged to have disrupted the plant by writing in the log book which Gauthier used to communicate with his shift supervisors. Plaintiff, on two occasions, crossed out gender-specific job titles where they were used and wrote the substitute terms in their place. Plaintiff desisted from this practice after receiving a reprimand from her supervisor. (Tr. at 360–61) Plaintiff's supervisor had, however, instructed plaintiff to consult that log book daily (Tr. at 397), and there is no evidence of any attempt by upper management to secure Gauthier's compliance with the company's policy of gender-neutrality.

The last claim Corning makes in justification of its decision to fire plaintiff concerns the quality of her work. Stumpf criticized the completeness of her oral report[15] at morning production meetings.[16] (Tr. at 236, 243, 274) Stumpf admitted, however, that the training of a Process Engineer in Glass Technology at Corning is largely a "self-training" that consists of working with more experienced personnel (Tr. at 272), apparently the same persons who refused to work with plaintiff because of her "attitude".[17] Stumpf further testified that, even when training proceeds normally, it "would probably take a year, a year and a half" before a new employee attained proficiency at diagnosing defects.[18] (Tr. at 273)

In rebuttal to these claimed non-discriminatory motives for discharge, plaintiff submits evidence that a marked copy of the decision in *Donaldson v. Pillsbury Co.*, 406 F.Supp. 1210 (D.Minn.1976), was circulated among Corning management and was in her personnel folder at the time of her discharge. (Tr. at 93; 185–86) Among the findings the *Donaldson* court made in dismissing the Title VII claim before it were that the plaintiff was habitually tardy, that she performed her duties in a "superficial" manner, and that she exhibited an "incooperative [sic] and insubordinate work attitude."

**B. Discussion**

 Drawing all justifiable inferences from the evidence in the non-moving party's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), this court cannot say that Corning is entitled to judgment as a matter of law. Sexual discrimination violates Title VII where it "create[s] a hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986). Plaintiff easily satisfies the *prima facie* requirement of showing that "she was treated less fairly than men in circumstances from which a gender-based motive could be inferred." *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 309 (2d Cir.1981).[19] Corning has articu-

---

**15.** The oral report was "more or less [a] give and take discussion" which plaintiff was expected to initiate, but in which other technical personnel were expected to participate. (Tr. at 274)

**16.** Although Corning was aware of plaintiff's charges of discrimination no later than six weeks after plaintiff was fired, Stumpf testified that the company had preserved none of her written reports and that complaints about her job performance centered mainly around her oral reports at the morning production meetings. (Tr. at 274)

**17.** Indeed, plaintiff's own immediate supervisor, who was responsible for supervising two employees, ceased being helpful to plaintiff after only three weeks. (Tr. at 78–80)

**18.** At the administrative hearing, Corning was asked to provide figures that would corroborate its contention that plaintiff's inadequate performance affected the output of the Fallbrook plant. (Tr. at 276) Corning was unable to comply with the request. (Tr. at 389–90)

**19.** Plaintiff has tendered sufficient proof that her job performance was satisfactory, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), in the form of Corning's admission that it fired her for the sake of plant "morale," and only after finding no suitable job openings elsewhere within the company. Tunis Aff't, Attach. 8.

lated non-discriminatory reasons for its actions. It now falls to plaintiff to show that the non-gender-based motives which Corning has offered in support of its decision to fire her are pretextual. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ The first motive Corning proffers, tardiness, appears "unworthy of credence," *id.*, in light of Corning's long acquiescence in plaintiff's practice of arriving for work after 8:00 a.m. Plaintiff's own supervisor approved that practice, telling plaintiff that she need not arrive precisely at 8:00 provided she was able to prepare her morning report by 9:30.

■ Plaintiff's alleged "unfriendliness," even if proven at trial, is insufficient to defeat her claim of discriminatory treatment. The evidence establishes that plaintiff's "attitude" changed, if at all, only in response to the hostility which plaintiff encountered from her supervisor, from other supervisors, and from non-supervisory employees at Corning. Unfriendliness induced by a hostile work environment can hardly justify the firing of the employee who was subjected to that environment. *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1233–34 (7th Cir.1986). *Cf. McKee v. SCM Corp.*, 38 Empl.Pract.Dec. ¶ 35,617, at 39,772 (D.Md. Oct. 10, 1985) [available on WESTLAW, 1985 WL 325] (discharge for "inability to interface" not pretext where no evidence that such inability was in response to hostile work environment).

■ The claim that plaintiff was "disruptive" is supported by little in the way of concrete instances. The incident of plaintiff's writing in Gauthier's log book was isolated, and in any case clearly did not precipitate plaintiff's discharge. As for plaintiff's alleged habit of correcting employees', including supervisors', use of officially disapproved, gender-based job titles, there is no evidence of any resulting disruption which might have justified her discharge. Nor will Corning be heard to argue that plaintiff's discharge was legitimately motivated by her efforts to see vindicated a policy which Corning claimed to espouse but apparently refused to enforce. If plaintiff's actions were disruptive, it was because Corning was unwilling to take responsibility to eradicate an aspect of its working environment which it all but conceded was offensive.

■ Finally, for two different reasons, the court discredits Corning's complaints about plaintiff's job performance. First, plaintiff was employed for only a fraction of the time which Corning admits is necessary to acquire proficiency in the position she held. Second, and more critical, the supervisory personnel on whom plaintiff relied for training in her profession were unwilling to help her learn it.

Corning argues that plaintiff's allegations "merely involve isolated incidents of a trivial nature," and that management "took appropriate positive action in response to each of plaintiff's complaints." Br. at 23. The evidence, construed in plaintiff's favor, bears out neither of these claims. The latter is belied, *inter alia*, by Corning's failure even to attempt to identify the offending trades employees, much less to discipline them. Corning took inadequate action to police its plant in accordance with its own work-place rules—rules governing the posting of sexually offensive matter in the plant and disapproving the use of offensive gender-based job titles—and left plaintiff personally to suffer the recriminations of employees who resented those rules. Among the resentful employees were supervisors who denied plaintiff the opportunity to become proficient in her profession. On these facts, the court has no difficulty concluding that the harassment to which plaintiff was subjected was "sufficiently severe or pervasive 'to alter the conditions of [her] employment and create an abusive working environment'." *Meritor Sav. Bank*, 477 U.S. at 67, 106 S.Ct. at 2406 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).

Because Corning is not entitled to a summary judgment of dismissal of plaintiff's claim of sexual harassment on a theory of

hostile environment, the court does not consider her alternative theories of *quid pro quo* or retaliation. Corning's Second Motion for Summary Judgment is denied in all respects.

IT IS SO ORDERED.